**UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS**

No. 20-3367

DANIEL D. BARRY, APPELLANT,

V.

DENIS MCDONOUGH,
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Argued October 25, 2021                                        Decided February 3, 2022)

*Kenneth H. Dojaquez*, of Topeka, Kansas, for the appellant.

*Melissa C. Loomis*, with whom *James M. Byrne*, General Counsel; *Mary Ann Flynn*, Chief Counsel; and *Sarah W. Fusina*, Deputy Chief Counsel, all of Washington, D.C., were on the brief for the appellee.

Before ALLEN, FALVEY, and JAQUITH, *Judges*.

ALLEN, *Judge,* filed the opinion of the Court. JAQUITH, *Judge*, filed an opinion concurring in part and dissenting in part.

ALLEN, *Judge*: As a general matter, VA compensates veterans for service-connected conditions by applying the Schedule for Rating Disabilities, which is meant to reflect the average impairment in earning capacity those conditions cause.[1] But Congress has also provided that, under certain circumstances, veterans will be entitled to receive compensation at a disability rate above that provided in the rating schedule. One device for providing such additional compensation is special monthly compensation (SMC).[2] This appeal concerns certain aspects of the SMC structure Congress has created and VA has implemented through its regulations.

Appellant Daniel D. Barry served the Nation honorably in the U.S. Army from July 1969 to November 1971.[3] We gratefully acknowledge Mr. Barry's extraordinary service in Vietnam, for which he earned a Purple Heart. In this appeal, which is timely and over which the Court has

---

[1] *See* 38 U.S.C. § 1155; *see also* 38 C.F.R. § 3.321(a).

[2] *See* 38 U.S.C. § 1114.

[3] Record (R.) at 3326.

jurisdiction,[4] he contests a March 16, 2020, Board of Veterans' Appeals decision that denied entitlement to SMC at the rate payable under 38 U.S.C. § 1114(n).[5]

This matter was submitted to a panel of the Court principally to address 38 C.F.R. § 3.350(f)(3), a portion of the regulation VA promulgated to implement the SMC program Congress established. As we will explain, § 3.350(f)(3) allows a veteran to receive an intermediate or half-step rating increase in SMC under certain circumstances, a rating device we will describe in more detail below.[6] The specific question we address today is whether § 3.350(f)(3) may be used more than once to provide for such an intermediate or half-step rating increase for SMC. In other words, does § 3.350(f)(3) provide for only one intermediate rating or may it be used to provide multiple intermediate ratings subject only to the maximum rate payable for SMC? Because we hold that § 3.350(f)(3) entitles a claimant to receive only one half-step rating increase in SMC benefits, we conclude that the Board did not err when it failed to discuss the possibility of entitlement to any additional half-step ratings under § 3.350(f)(3). We also conclude that appellant's other arguments on appeal are without merit. Accordingly, we will affirm the March 2020 Board decision.

## I. FACTS AND PROCEDURAL HISTORY

Since 1971, appellant has been receiving disability compensation benefits for injuries he suffered as a result of a landmine explosion that led to an above-the-knee amputation of his right leg. In addition to SMC benefits appellant receives for above-the-knee amputation of his right leg, loss of use of both feet, and loss of use of one eye, appellant is service connected for PTSD (with a 70% disability rating), a right shoulder condition (60%), a left shoulder condition (50%), a left eye disability (30%), left eye disfigurement (30%), bilateral hearing loss (20%), a lumbar spine injury (10%), a right hand injury (10%), left and right hip disabilities (10% each), hypertension (10%), and tinnitus (10%). He also has noncompensable service-connected disabilities that are not at issue here. Appellant has had a combined 100% disability rating since 1971, to which VA has added his SMC benefits.

---

[4] *See* 38 U.S.C. §§ 7252(a), 7266(a).

[5] R. at 5-10.

[6] We use "half-step" and "intermediate" interchangeably in this opinion.

Relevant to this appeal, appellant receives SMC benefits under section 1114(p), title 38, U.S. Code, at an intermediate rate, that is a rate between sections 1114(m) and 1114(n) per 38 C.F.R. § 3.350(f)(3). Appellant sought an increase in SMC, which was ultimately denied by the regional office (RO), and appellant appealed to the Board. After the Board ruled against him, appellant appealed to this Court. In August 2019, the Court remanded appellant's claim for increased SMC under section 1114(n) because the Board failed to consider SMC exceptions under § 3.350(f)(4). Appellant raised no issues concerning an increased SMC rating under § 3.350(f)(3); his appeal focused entirely on (f)(4).

In March 2020, the Board issued the decision on appeal, concluding that appellant is not entitled to SMC at the rate provided under section 1114(n). The Board explained that appellant already receives an intermediate rate increase under § 3.350(f)(3), and the exception under § 3.350(f)(4) that allows for a full step increase was not available to appellant given the nature of his disabilities. As to subsection (f)(4), the Board recognized that independent of appellant's loss of use in the lower extremities (a reason why he receives SMC benefits already), his additional disabilities are collectively rated at 100%.[7] But the Board went on to explain that the exception allowing increased SMC under "(f)(4) requires that the separate 100[%] disabling disability be a single disability, not simply a combination of disabilities stemming from the same etiology."[8] The Board assessed the differences in the language between § 3.350(f)(3) and (f)(4) to support its conclusion.[9] This appeal followed.

## II. PARTIES' ARGUMENTS

Appellant's primary argument on appeal is that the Board misinterpreted § 3.350(f)(3) and, therefore, erred when it did not consider whether he was entitled to additional SMC benefits under that provision. Appellant posits that intermediate ratings under § 3.350(f)(3) are not limited to just one half-step increase. Rather, he asserts that the plain language of the regulation provides for as many intermediate increases as a claimant's condition can justify, subject only to the maximum SMC rate Congress has set. In that regard, he provides an example of how he believes § 3.350(f)(3) should have been applied in his case. His application goes like this: we start with appellant's

---

[7] R. at 6-7.

[8] R. at 7.

[9] R. at 7-9.

entitlement to SMC(m) based on the loss of use of his legs; then VA should consider that he has a 70% rating for PTSD that allows him to go up one intermediate step to receive compensation at the SMC(m 1/2) level; then VA should consider that he has two 30% ratings for left eye conditions that combine to make a 50% rating, which entitles him to another intermediate step to receive compensation at the SMC(n) level; then combining his left and right shoulder ratings, he would get another intermediate increase up the SMC(n 1/2) level; and finally, the remainder of his disabilities combine to a 50% rating that entitles him to obtain the maximum rate for SMC benefits, provided for at the SMC(o) level.[10]

Alternatively, appellant argues that § 3.350(f)(4) provides grounds for him to obtain SMC at a higher rate. He doesn't contest the Board's decision that none of his disabilities are independently rated at 100% such that he would be entitled to greater SMC benefits under subsection (f)(4).[11] Rather, he maintains that § 3.350(f)(4) is invalid because it prohibits a total disability rating based on individual unemployability (TDIU) awarded under 38 C.F.R. § 4.16 from being used as the equivalent of a 100% rating for a single disability, such that subsection (f)(4) would warrant an increase in his SMC compensation. He explains that his request for increased SMC compensation raised the issue of entitlement to TDIU, which, as we noted, he argues equates to a total disability rating that would make him eligible for increased SMC under § 3.350(f)(4). Therefore, he posits that "the Secretary's restriction in § 3.350(f)(4) that only a 100% schedular rating can qualify a veteran for a full increase in SMC benefits is contrary to [his] own regulations."[12]

Finally, appellant raises a second alternative argument, asserting that the record reasonably raises the issue of entitlement to an extraschedular rating under the current version of 38 C.F.R. § 3.321(b). He contends that what he characterizes as his request for a total rating was enough to raise the issue of entitlement to an extraschedular rating under § 3.321(b), and the Board erred by not considering it.[13]

---

[10] The record reflects that appellant has been receiving SMC at the (m 1/2) level since 2005, R. at 573, so we assume that appellant's explanation in his brief starting at the lower (m) level is merely for demonstrative purposes.

[11] Because he raises no argument about this point, he has abandoned any appeal about it. *See Pederson v. McDonald*, 27 Vet.App. 276, 283 (2015) (en banc).

[12] Appellant's Brief (Br.) at 15.

[13] *Id.* at 8.

For his part, the Secretary argues that appellant's interpretation of § 3.350(f)(3) is incompatible with the regulatory and statutory scheme for the provision of SMC benefits. The Secretary explains that a plain reading of § 3.350(f)(3), and review of 38 U.S.C. § 1114(p), the relevant portion of the authorizing statute, provides for only one intermediate step increase for any additional disabilities independently rated at 50% or more, not multiple intermediate step increases. He also notes that appellant raised this argument for the first time before the Court in this appeal and urges us to decline to address it. During oral argument, the Secretary maintained that if the Court concludes that § 3.350(f)(3) is ambiguous, then his interpretation should receive deference.[14]

Second, the Secretary asserts that the Court should reject appellant's argument that § 3.350(f)(4) is invalid not only because appellant raised this argument for the first time on appeal (just as he raised the subsection (f)(3) argument), but also because appellant does not contest the Board's determination that he is ineligible for a full step increase under § 3.350(f)(4) other than with respect to TDIU. But, the Secretary continues, appellant has not been adjudicated to be entitled to TDIU. So, because he is not in receipt of TDIU and does not contest the Board's determination that he is ineligible for a full step increase under § 3.350(f)(4), the Secretary maintains that appellant's request that the Court invalidate the portion of (f)(4) addressing TDIU is tantamount to asking the Court to issue a prohibited advisory opinion. The Secretary then asserts that if the Court decides to address the issue on the merits, appellant's argument fails because the regulation's express prohibition on using TDIU to justify a full-step increase is not unlawful.

Finally, the Secretary asserts that the Court should not address entitlement to an extraschedular rating under § 3.321(b) because that issue was neither expressly argued to the Board nor reasonably raised by the record. He states that the purpose of extraschedular ratings is to compensate veterans when their disabilities are incapable of evaluation under the rating schedule. And here, appellant has not argued that any of his service-connected disabilities is so severe or manifests in such unusual or extraordinary symptoms that a schedular rating is inadequate.

In his reply brief, appellant did not address the Secretary's assertions that the issues concerning §§ 3.350(f)(3) and (f)(4) are raised for the first time on appeal and, therefore, the Court should not consider them. However, during oral argument he urged us to exercise our discretion

---

[14] Oral Argument at 43:22-43:29, *Barry v. McDonough*, U.S. Vet. App. No. 20-3367 (oral argument held Oct. 25, 2021), http://www.uscourts.cavc.gov/oral_arguments_audio.php.

to hear his arguments on the merits. Additionally, appellant concedes that he never argued that the rating schedule was not capable of compensating his individual disabilities. Rather, he clarified that his extraschedular rating argument is that because he asked for a total rating under § 3.350(f)(4), the Board was required to consider whether referral for an extraschedular rating under § 3.321(b) was warranted.[15]

### III. ANALYSIS

As we noted above, appellant's principal argument on appeal concerns the operation of 38 C.F.R. § 3.350(f)(3). He then provides a first alternative argument focusing on 38 C.F.R. § 3.350(f)(4) and a second alternative under 38 C.F.R. § 3.321(b). We will follow appellant's lead and consider these arguments in the order of priority he has used. But before doing so, we must consider an antecedent question about whether we should address the arguments on the merits at all, given that appellant did not raise any of them before the Board.

#### A. Issue Exhaustion

Our first task is to consider whether to invoke the doctrine of issue exhaustion and decline to address appellant's arguments, all of which have been raised for the first time on appeal to this Court. Traditionally, when presented with an argument newly raised on appeal over which we have jurisdiction, the Court has discretion to hear the argument, decline to address it, or remand the matter as appropriate.[16] Exercising this discretion entails a case-by-case analysis that weighs appellant's interests against the "institutional interests the doctrine exists to service."[17] The law continues to recognize the longstanding "importance of issue exhaustion with respect to administrative tribunals" because "'orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while [the agency] has opportunity for correction in order to raise issues reviewable by the courts.'"[18]

The U. S. Court of Appeals for the Federal Circuit has held that issue exhaustion is appropriate when "[a] veteran raises an argument for the first time on appeal to the Veterans Court

---

[15] Reply Br. at 7.

[16] *Maggitt v. West,* 202 F.3d 1370, 1377-89 (Fed. Cir. 2000); *see also* 38 U.S.C. §. 7252(a).

[17] *Maggitt*, 202 F.3d at 1377.

[18] *Scott v. McDonald*, 789 F.3d 1375, 1377 (Fed. Cir. 2015) (quoting *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)).

and the Veterans Court determines that the VA's institutional interests outweigh the interests of the veteran under the balancing test set forth in *Maggitt*."[19] In *Maggitt*, the Federal Circuit held that, because exhaustion of administrative remedies is not a jurisdictional requirement in the veterans benefits system, this Court may hear arguments raised before it in the first instance provided it otherwise has jurisdiction over the appeal.

We acknowledge that recently, in *Carr v. Saul*, the Supreme Court addressed issue exhaustion in the context of nonadversarial administrative proceedings before the Social Security Administration (SSA). In that context, and with respect to the particular argument at issue in *Carr*, the Supreme Court held that it was error for a court to impose an issue-exhaustion requirement on constitutional challenges not raised before the SSA.[20] Specifically, the Supreme Court held that claimants who applied for SSA disability benefits and who had hearings conducted or decisions issued by an administrative law judge (ALJ) whose appointment purportedly was not in accordance with the Appointments Clause of the U.S. Constitution were not required to assert such Appointments Clause challenges before the SSA and could appropriately raise them for the first time in Federal court.[21] The Supreme Court explained that in nonadversarial administrative proceedings the issue exhaustion doctrine should not be used for, at least, constitutional questions, "which usually fall outside the adjudicator's areas of technical expertise[,]" and futile questions, which are questions that are beyond the authority of an agency to address.[22] But the Supreme Court also suggested that "in the sphere of routine objections to individual benefits determinations, the scales might tip differently."[23]

It may be that *Carr* has affected how courts should consider issue exhaustion in the context of veterans benefits determinations. While the Supreme Court specifically addressed the concept in connection with SSA administrative adjudication, the Court's reasoning was frequently based on the more general differences between adversarial and nonadversarial proceedings.[24] However,

---

[19] *Dickens v. McDonald*, 814 F.3d 1359, 1361 (Fed. Cir. 2016); *see Scott*, 789 F.3d at 1377-81 (addressing contexts in which the requirement of issue exhaustion is appropriate).

[20] 141 S. Ct. 1352, 1362 (2021).

[21] *Id*. at 1362.

[22] *Id.* at 1360-61.

[23] *Id.*; *id.* at 1360 n.5.

[24] *Id*. at 1358-62.

while we have considered *Carr*, we need not assess its potential implications today. That is so because we conclude that it is appropriate for us to consider all appellant's arguments on the merits based on traditional issue exhaustion principles, which, if anything, provide for issue exhaustion to be employed in more situations than is likely the case under *Carr*.

We begin with appellant's argument that 38 C.F.R. § 3.350(f)(4) is invalid. Though appellant raised this argument for the first time on appeal, it is clearly appropriate for us to consider this argument. The Board is bound by VA regulations.[25] So, it would have been futile for appellant to raise this argument before the Board. "Resort to the administrative process is futile if the agency will almost certainly deny any relief . . . because it . . . lacks jurisdiction over[] the matter."[26] And as the Supreme Court recently held in *Carr*, "[i]t makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested. Such a vain exercise will rarely 'protect administrative agency authority' or 'promot[e] judicial efficiency.'"[27] Therefore, it is appropriate for us to consider appellant's argument concerning the invalidity of § 3.350(f)(4).

We will also exercise our discretion to address appellant's arguments concerning § 3.350(f)(3) and § 3.321(b) on the merits. These arguments call on us to make purely legal determinations. And when we decide such legal questions, we do so de novo.[28] Of course, we recognize that an agency has an important interest in addressing regulations within its expertise even if a court will usually interpret those regulations without deference to the agency.[29] Therefore, we acknowledge that there are institutional factors that weigh in favor of employing issue exhaustion principles here. But on balance we believe that the individual interests carry the day. Appellant is in a favored class: veterans. His challenge in large measure does not call on the Agency to employ its expertise and *apply* legal principles to assess his particular circumstances. Instead, he asks that the Court make certain legal determinations that would frame *how* the Agency

---

[25] *See* 38 U.S.C. § 7104(c).

[26] *Wolfe v. Wilkie*, 32 Vet.App. 1, 39 (2019) (quoting *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986)).

[27] *Carr*, 141 S. Ct. at 1361 (quoting *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992)).

[28] *See Foster v. McDonough*, 34 Vet.App. 338, 344-45 (2021); *see also Butts v. Brown*, 5 Vet.App. 532, 539 (1993) (en banc).

[29] *See Bowen v. City of New York*, 476 U.S. 467, 485 (1986) ("Because of the agency's expertise in administering its own regulations, the agency ordinarily should be given the opportunity to review application of those regulations to a particular factual context.").

would assesses his claims. And the appellate judicial process has allowed VA to advance its views about the legal questions at issue, protecting the institutional interests we recognize are in play. And finally, appellant was represented by a non-attorney agent before the Board. Given the complex legal issues at the core of appellant's arguments on appeal, the lack of a lawyer before the Agency cuts in appellant's favor. Accordingly, after carefully balancing the competing interests at stake, we will exercise our discretion to address appellant's arguments in the first instance.[30]

## B. Interpretation of § 3.350(f)(3)

We begin with basic, and likely familiar, principles underlying our interpretative endeavor. Questions of regulatory interpretation are questions of law that the Court reviews de novo.[31] The basics of regulatory interpretation are well established. We look first to text and structure of a regulation, which is the best indication of its plain meaning.[32] If the plain meaning of the regulation is clear on its face, then such plain meaning controls, and "that is 'the end of the matter.'"[33]

While the plain language of a regulation is critically important to the interpretive effort, it is not uncommon for courts to consider other things to assess a regulation's meaning. In other words, regulatory interpretation requires the Court to "bring all its interpretative tools to bear" and to "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning."[34] As Justice Kagan recently made clear on behalf of the Supreme Court, "a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read. Agency regulations can sometimes make the eyes glaze over. But hard interpretive conundrums, even relating to complex rules, can often be solved."[35] A regulation could be genuinely ambiguous to the extent it may not directly address an issue, or it may prove susceptible to more than one reasonable reading when applied to some

---

[30] *Carr*, 141 S. Ct. at 1360-61; *Maggitt*, 202 F.3d at 1377.

[31] *See Foster*, 34 Vet.App. at 344-45.

[32] *See Goodman v. Shulkin*, 870 F.3d 1383, 1386 (Fed. Cir. 2017).

[33] *Tropf v. Nicholson*, 20 Vet.App. 317, 320 (2006) (quoting *Brown v. Gardner*, 513 U.S. 115, 120 (1994)); *see also Kisor v. Wilkie*, __U.S. __, __, 139 S. Ct. 2400, 2415 (2019).

[34] *Kisor*, 139 S. Ct. at 2421; *see Savage v. Shinseki,* 24 Vet.App. 259, 265 (2011) (citing *Black & Decker Corp. v. Comm'r of Internal Revenue*, 986 F.2d 60, 64 (4th Cir.1993) ("Regulations, like statutes, are interpreted according to canons of construction.")).

[35] *Kisor*, 139 S. Ct. at 2415.

fact patterns.[36] But a regulation is not ambiguous simply because both parties insist that the plain meaning supports his or her position and neither party's interpretation is unreasonable to the Court.[37]

Before we turn to § 3.350(f)(3) in particular, a little background about SMC is in order to provide context. SMC is available when a veteran's service-connected disability or disabilities cause "additional hardships above and beyond those contemplated by VA's schedule for rating disabilities."[38] The rate of SMC "varies according to the nature of the veteran's service-connected disabilities."[39] Basic levels of SMC are listed in section 1114(k), providing for compensation where a veteran, as a result of service-connected disability, has also suffered one of the listed forms of anatomical loss.

A veteran who meets the requirements set out in section 1114(k) can potentially receive additional benefits through the SMC structure Congress has created. Namely, higher levels of SMC may be awarded if, in addition to one or more of the disabilities specified in subsection (k), the veteran also meets the requirements for any of the rates specified in subsections (l) through (o).[40] And, in cases where a veteran is entitled to an SMC rate between (l) and (n) and also has additional service-connected disabilities not captured by any SMC rate, the SMC rate can be increased by either a half or a full step, but not more than the maximum SMC rate set out in subsection (o).[41] Specifically, section 1114(p) provides that "in the event the veteran's service-connected disabilities exceed the requirements for any of the rates prescribed in this section, the Secretary may allow the next higher rate or an intermediate rate, but in no event in excess of $4,667."

Now let's turn to the focus of this appeal concerning SMC. Section 3.350, VA's implementing regulation for SMC ratings, provides for full and half-step rate increases in SMC in

---

[36] *Id*. at 2410.

[37] *Id*. at 2423.

[38] *Breniser v. Shinseki*, 25 Vet.App. 64, 68 (2011); *see* 38 U.S.C. § 1114(k)-(s). SMC is a statutory benefit provided for strictly noneconomic purposes to compensate veterans who suffered anatomical loss as a result of a service-connected disability, no formal claim is ever required, and it is always in addition to compensation benefits already being received. When more than one SMC rate is applicable, rates are calculated using the combined ratings table.

[39] *Moreira v. Principi*, 3 Vet.App. 522, 524 (1992).

[40] 38 U.S.C. § 1114.

[41] 38 U.S.C. § 1114(p). There are seven levels of SMC rates between (l) and (o): (l), (l 1/2), (m), (m 1/2), (n), (n 1/2), and (o).

certain circumstances. As germane here, a half-step increase is provided for under § 3.350(f)(3), which states:

> ***Additional independent 50 percent disabilities.*** In addition to the statutory rates payable under 38 U.S.C. [§] 1114 (l) through (n) and the intermediate or next higher rate provisions outlined above, additional single permanent disability or combinations of permanent disabilities independently ratable at 50 percent or more will afford entitlement to the next higher intermediate rate or if already entitled to an intermediate rate to the next higher statutory rate under 38 U.S.C. [§] 1114, but not above the (o) rate. In the application of this subparagraph the disability or disabilities independently ratable at 50 percent or more must be separate and distinct and involve different anatomical segments or bodily systems from the conditions establishing entitlement under 38 U.S.C. [§] 1114 (l) through (n) or the intermediate rate provisions outlined above.

A full-step increase is provided for under § 3.350(f)(4),[42] which states:

> ***Additional independent 100 percent ratings.*** In addition to the statutory rates payable under 38 U.S.C. [§] 1114 (l) through (n) and the intermediate or next higher rate provisions outlined above additional single permanent disability independently ratable at 100 percent apart from any consideration of individual unemployability will afford entitlement to the next higher statutory rate under 38 U.S.C. 1114 or if already entitled to an intermediate rate to the next higher intermediate rate, but in no event higher than the rate for (o). In the application of this subparagraph the single permanent disability independently ratable at 100 percent must be separate and distinct and involve different anatomical segments or bodily systems from the conditions establishing entitlement under 38 U.S.C. [§] 1114 (l) through (n) or the intermediate rate provisions outlined above.

To review where the parties stand, appellant argues that a plain reading § 3.350(f)(3) shows that if a veteran has multiple disabilities rated at least at 50%, each disability rated 50% (and each combination of disabilities adding up to 50%) allows for a half step increase up until the point at which the claimant reaches the upper limit for SMC in section 1114(o). In other words, he maintains the plain language of the regulation shows that one is not limited to just a single half-step increase. In contrast, the Secretary asserts that the plain meaning of § 3.350(f)(3) allows for only one half-step increase, regardless of how many disabilities a claimant has that are service connected and rated 50% disabling.

---

[42] While one of appellant's alternative arguments focuses directly on (f)(4), we set the regulation out here because it provides some context for our interpretation of (f)(3).

Confining ourselves for a moment to subsection (f)(3) in isolation, there is some indication that the regulation does not provide for multiple half-step increases. First, (f)(3) employs the phrase "additional single permanent disability *or* combinations of permanent disabilities independently ratable at 50[%] or more."[43] The use of "or" suggests a choice of one thing or another. If appellant's view were correct, it seems "and" would be more appropriate. In addition, having such a qualifying disability or combination of disabilities allows for "entitlement to *the* next higher intermediate *rate*."[44] The use of the term "the" in conjunction with the singular term "rate" points in the Secretary's direction.

Despite these textual clues, the reality is that the plain language of § 3.350(f)(3) standing alone does not conclusively resolve the issue dividing the parties. The regulation doesn't clearly answer the question we face. But that does not mean that we should immediately "wave the ambiguity flag."[45] Based on an assessment of the regulation using the wide array of interpretive tools at our disposal (with our subsection (f)(3) focused points in the background), we ultimately agree with the Secretary that § 3.350(f)(3) permits only one intermediate increase.

Section 3.350(f) implements section 1114(p). In section 1114(p), Congress provides that "the Secretary may allow *the* next higher *rate* or *an* intermediate *rate*."[46] The use of the terms "the" and "an" in conjunction with the singular term "rate" in the authorizing statute indicates that one singular "rate" would be provided through any regulation the Secretary adopted to implement the statute. Moreover, this interpretation is most consistent with the rest of the statute's language and structure. For example, section 1114(k) provides that "the rate of compensation therefor shall be [X amount] for *each such loss*."[47] The italicized language suggests that multiple losses can qualify for SMC under subsection (k), standing in stark contrast to the more limited language in section 1114(p). We have previously found such intrastatutory comparisons useful when interpreting section 1114.[48]

---

[43] 38 C.F.R. § 3.350(f)(3) (2021) (emphasis added). The regulation goes on to repeat the "disability or combination of disabilities" language in a separate sentence.

[44] *Id*. (emphasis added).

[45] *Kisor*, 139 S. Ct. at 2415.

[46] 38 U.S.C. § 1114(p) (emphasis added).

[47] 38 U.S.C. § 1114(k) (emphasis added).

[48] *See Bria v. Wilkie*, 33 Vet.App. 228, 232-36 (2021).

In addition, VA's implementing regulation, § 3.350(a), recognizes the plurality of the statute. It provides that SMC under section 1114(k) "is payable for *each* anatomical loss or loss of use" of the anatomy specified.[49] The fact that Congress chose to include the language providing for multiple applications of an SMC rate, i.e., section 1114(k), in one part of the statute, but not in others, i.e., section 1114(p), is compelling. And VA's implementation of those varying approaches through its implementing regulations is a faithful application of the choices Congress made. When Congress drafted section 1114 and chose to include certain language in one situation but not in another, we can assume that this decision was intentional.[50] Thus, if VA or Congress intended section 1114(p) to allow for multiple applications, like section 1114(k), both the statute and implementing regulations would have been written differently. For example, with respect to half-step increases, either the statute or regulation could have used the phrase "for each such loss or losses" after the term "rate."

And we can't forget how significant section 1114(p) is because it is what provides VA with the authority to adopt § 3.350(f)(3) in the first place. VA is powerless to provide more benefits than Congress elected to authorize.[51] The language in § 3.350(f)(3) is at least clear that "entitlement to *the* next higher intermediate *rate*" will be afforded when the requirements are met.[52] This language does not conflict with the statute's language that "the Secretary may allow *the* next higher *rate* or *an* intermediate *rate*."[53] Indeed, we think this language does precisely what Congress authorized. But even if we thought that the regulation *could* be read to provide *more* than Congress authorized, we would not lightly assume that the Agency went beyond the authority Congress provided. In that regard, when a regulatory provision can be interpreted in a way that harmonizes it with the statute it implements, courts should adopt such a harmonious interpretation.[54]

---

[49] 38 C.F.R. § 3.350(a).

[50] *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972))).

[51] Contrary to our dissenting colleague's contention, our reading of the regulation is consistent with the plain meaning of the language used by Congress in section 1114(p) to authorize only one full or one one-half step SMC rate increase. Just because "Congress could have used stricter and more narrowly tailored language," *post* at 20, does not empower us to ignore the plain meaning of the language Congress did use.

[52] 38 C.F.R. § 3.350(f)(3) (emphasis added).

[53] 38 U.S.C. § 1114(p) (emphasis added).

[54] *United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 25 (1982) ("We consider first whether the [r]egulation harmonizes

Finally, to give real meaning to § 3.350(f)(4), which, recall, provides for a full-step increase, we think that subsection (f)(3) cannot practically mean that multiple half-step increases are possible. It would be odd to say that a veteran may obtain higher benefits using multiple half-steps to get a full-step increase (or, as appellant's example for his case shows, even more) under subsection (f)(3), without meeting the fairly restrictive requirements for the full-step increase under subsection (f)(4). Canons of construction require us to avoid rendering any portions of a regulation meaningless or superfluous.[55] While it may not be that appellant's interpretation of subsection (f)(3) renders subsection (f)(4) entirely meaningless, it strikes us that appellant's interpretation of subsection (f)(3) undermines subsection (f)(4) in a way that suggests appellant's interpretation is not the better of the competing conceptions the parties have advanced.

In sum, we hold that § 3.350(f)(3) can only be used once to increase a claimant's SMC rate.[56] As explained above, there are indications pointing to that interpretation even if we confined ourselves to the language of (f)(3) standing alone. In addition, Congress purposefully omitted language concerning repeated use in section 1114(p), on which (f)(3) is based, despite permitting repeated use in other sections of the statute. And, reading § 3.350(f)(3) as we do, provides purpose for its subsequent subsection (f)(4). Because we can use the tools of interpretation to assess the regulation's meaning, we need not resort to other canons of construction, including deference to the Agency's interpretation of the regulation were it "genuinely ambiguous" or the pro-veteran rule of construction from *Brown v. Gardner*.[57] Therefore, we hold that the Board did not err when it failed to consider the application of § 3.350(f)(3) more than once in its assessment of whether appellant was entitled to a higher SMC rate.

---

with the statutory language."); *Anthony v. United States*, 520 F.3d 374, 380 (5th Cir. 2008) ("[C]ourts should not interpret an agency regulation to thwart the statutory mandate it was designed to implement.").

[55] *See Splane v. West*, 216 F.3d 1058, 1068-69 (Fed. Cir. 2000) ("[C]anons of construction . . . require us to give effect to the clear language of a [regulation] and avoid rendering any portions meaningless or superfluous.").

[56] Our dissenting colleague disagrees with our holding in this regard and asserts that under § 3.350(f)(3) appellant is entitled to an SMC(n) rate. Under that logic, appellant would be eligible for at least two half-step increases in his SMC rate but no more. This is a result neither party advocated. It's not clear to us why, given our dissenting colleague's position on the meaning of § 3.350(f)(3), one would stop at two half-step increases.

[57] Our dissenting colleague spends significant time discussing how, precisely, the pro-veteran canon of construction from *Brown v. Gardner* fits into statutory and regulatory interpretation more generally. This is certainly an important issue and, as the dissent makes clear, one that deeply divided the Federal Circuit. But we express no views concerning the pro-veteran canon's place within the "order of operations" used for statutory and regulatory interpretation. Consistent with *Kisor*, we do not need to reach that question because the interpretive tools that we rely on, including, most importantly, adherence to the authorizing statute in section 1114, bears out our interpretation of § 3.350(f)(3).

*C. TDIU and § 3.350(f)(4)*

We will now briefly address appellant's two alternative arguments concerning purported Board errors. Starting with § 3.350(f)(4), appellant contends that this portion of the regulation is invalid because it excludes TDIU as a basis on which to provide a veteran with a full-step increase for SMC, and the Board, therefore, erred when it denied him an increase under § 3.350(f)(4). There are multiple levels to this argument. First, appellant asserts that the Board failed to consider the reasonably raised issue of entitlement to TDIU based on the severity of his vision, shoulder, and hip disabilities. Second, appellant maintains that the Board is required to treat a TDIU rating as a total rating per § 4.16(b). Finally, appellant contends that had the Board applied § 3.350(f)(4) properly, it would have awarded him a full-step increase based on his purported entitlement to TDIU. He requests that we find § 3.350(f)(4) invalid to the extent it excludes TDIU from consideration as basis for a full-step increase and that we remand the matter to the Board to correctly apply the law. The Court is not persuaded.

The Board must address all potentially applicable regulations that are reasonably raised by the record.[58] Entitlement to TDIU "is implicitly raised whenever a pro se veteran, who presents cogent evidence of *unemployability*, seeks to obtain a higher disability rating."[59] Thus, we have held that the Board may be required to address TDIU where there is evidence of an inability to work and the veteran is not in receipt of the maximum rating.[60] As we have explained, TDIU is not a separate claim, "but rather involves an attempt to obtain an appropriate rating for a disability or disabilities."[61]

Appellant has been in receipt of a total combined disability rating, plus SMC(k) benefits, since November 1971, on the day after he was discharged from service. There is nothing in the record to show that the issue of *unemployability* arose at any point since 1971 and appellant has not contested any of his schedular ratings for his various service-connected disabilities.[62] Although

---

[58] *Schafrath v. Derwinski*, 1 Vet.App. 589, 593 (1991).

[59] *Comer v. Peake*, 552 F.3d 1362, 1367 (Fed. Cir. 2009) (emphasis added). Whether TDIU was explicitly raised is not at issue here; therefore, we need not consider it. *See* Appellant's Br. at 14 (contending only that "the issue of entitlement to TDIU for a single disability was reasonably raised by the record"); *see also Pederson*, 27 Vet.App. at 281-86.

[60] *Harper v. Wilkie*, 30 Vet.App. 356, 361 (2018).

[61] *Rice v. Shinseki*, 22 Cet.App. 447, 452 (2016).

[62] *Comer*, 552 F.3d at 1366 (requiring "cogent evidence of unemployability").

there is evidence in the record to suggest that he may have difficulties with employment, that does not show that he is *unable* to engage in substantially gainful occupation as a result of his service-connected disabilities. In sum, we don't think the record supports appellant's contentions that the issue of TDIU was reasonably raised.[63]

But even if we assumed that the record somehow suggested that the Board should have considered TDIU in connection with appellant's claims seeking an increase in his SMC benefits, that would matter not at all in terms of whether we can grant appellant the *remedy* he seeks. Recall that appellant has asked us to strike § 3.350(f)(4) down to the extent it excludes TDIU as a basis on which to grant increased SMC. But appellant is not in receipt of a TDIU. That simple truth means that we cannot consider appellant's challenge to § 3.350(f)(4) because it is *entirely* predicated on the exclusion of TDIU as a basis for increased SMC, a benefit to which appellant is not (at least yet) entitled. Although the validity of a regulation is a legal question, we cannot issue advisory opinions no matter how interesting the hypothetical question presented to us may be.[64] And that is clearly what appellant is asking us to do here because, as we've said, he is not in receipt of TDIU now. So, even if we struck down the regulation, it would not assist him in obtaining a greater rate for SMC unless there were other developments. Moreover, if appellant wishes to request TDIU, he is free to do so before VA. Until VA has found appellant to be entitled to TDIU, any matters flowing from how such an entitlement might or might not affect SMC are not ripe.

*D. Extraschedular Consideration*

Section 3.321(b) currently states that "[t]o accord justice in the exceptional case where the schedular evaluation is inadequate to rate a single service-connected disability, the Director of Compensation Service or his delegate is authorized to approve" an extraschedular evaluation.[65]

---

[63] *See Hilkert v. West,* 12 Vet.App. 145, 151 (1004) (en banc), *aff'd per curiam*, 232 F.3d 908 (Fed. Cir. 2000) (table).

[64] *See Barnett v. Wilkie*, 32 Vet.App. 83, 87 (2019) (declining to address an argument because doing so "would amount to an unauthorized advisory opinion"); *Quirin v. Shinseki*, 22 Vet.App. 390, 396 (2009) (holding that "the Court will not ordinarily consider additional allegations of error that have been rendered moot by the Court's opinion or that would require the Court to issue an advisory opinion"); *see also Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1337-38 (Fed. Cir. 2007) ("Under [the prohibition against advisory opinions] doctrine, federal courts are to decide only 'actual controversies by judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in the case before it.'" (quoting *Local No. 8-6, Oil, Chem. & Atomic Workers Int'l Union v. Missouri,* 361 U.S. 363, 367 (1960))).

[65] 38 C.F.R. § 3.321(b) (2021). Effective January 8, 2018, VA amended 38 C.F.R. § 3.321(b). *See* 82 Fed. Reg. 57,830, 57,834.

Appellant argues that the Board erred when it failed to address whether he is entitled to an extraschedular rating under the amended—that is current—version of § 3.321(b). He asserts that "the record reasonably raised a request to refer, to the Director of Compensation and Pension Services [(Director)], [his] ratings."[66] In his reply brief, appellant explains that "there is no legal requirement that [he] do more than ask for a total rating in order to raise [the issue of] entitlement to a[n extraschedular] rating under § 3.321(b)."[67] And he contends that because he is seeking a one-step increase in SMC under § 3.350(f)(4), and that is only available for a total rating, "this necessarily requires the Board to apply § 3.321(b) to achieve a total rating."[68]

Appellant offers no real authority to support his position, either factual or legal. Most significantly, although appellant is in receipt of service connection for multiple disabilities, he does not identify *any* disability that he claims has an exceptional disability picture warranting a higher evaluation under extraschedular rating principles. In addition to this fatal lack of proof—or even allegation—appellant's argument again amounts to an invitation for us to render some type of advisory opinion. Even if we assumed that the evidence reasonably raised the issue of extraschedular consideration for *some* (unidentified) disability for *some* (unidentified) reason, appellant agrees that the matter would need to be forwarded to the director for consideration. So, there is no guarantee that appellant would be awarded an extraschedular rating for any of his disabilities and, therefore, we would not be able to assess how any extraschedular consideration might affect an enhancement of his SMC rate just as we couldn't deal with the TDIU issue discussed above. And we note in addition that appellant doesn't seriously address these significant flaws in his argument. In sum, because appellant's argument is purely speculative and severely underdeveloped, we will not address it further.[69]

In addition to his argument that the record reasonably raised the issue of an extraschedular rating, we recognize that appellant also raises substantive arguments about how the current version

---

[66] Appellant's Br. at 17. We note that appellant refers to a previous organizational structure within VA. Currently, there is a Compensation Service with the Pensions and Fiduciary Service constituting a separate entity. SEE DEP'T OF VETERANS AFFAIRS, 2020 FUNCTIONAL ORGANIZATION MANUAL, at 20 (May 15, 2020), https://www.va.gov/VA-Functional-Organization-Manual-2020-4.pdf (last visited Nov. 20, 2021).

[67] Reply Br. at 8.

[68] *Id.* at 7.

[69] A "decision advising what the law would be on an uncertain or hypothetical state of facts" is the very definition of an advisory opinion. *Aldridge v. McDonald*, 27 Vet.App. 392, 394 (2015) (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Wallace*, 288 U.S. 249, 262 (1933)); *see also Locklear v. Nicholson*, 20 Vet.App. 410, 416 (2006).

of § 3.321(b) should be applied, as well as about the continued viability of this Court's caselaw in the extraschedular arena in light of the amendment to § 3.321(b). For the reasons we have explained, these issues are not ripe for review. So, to be clear, we express no opinion about these aspects of appellant's argument.

## IV. CONCLUSION

After consideration of the parties' briefs, oral argument, the governing law, and the record, the Court AFFIRMS the March 16, 2020, Board decision.


JAQUITH, *Judge*, concurring in part and dissenting in part: I join sections I, II, III.A, III.C, and III.D of the Court's opinion in full. And the first several paragraphs of III.B capably chronicle the principles for interpreting regulations, the context of SMC, the text of the salient subsections, and the parties' arguments. However, because I read the statute and regulation as plainly providing for two half-step increases—to the intermediate rate and, for the veteran already there, to the next higher statutory rate—I respectfully dissent from the Court's holding that only one half-step increase is available under § 3.350(f)(3), and from the Court's conclusion that the Board did not err when it failed to discuss the possibility of an additional half-step rating under § 3.350(f)(3).

### A. The Veteran's Combat Wounds and Disability Ratings

On October 23, 1970, a land mine exploded under then-Sergeant Barry while he was engaged in combat operations against hostile forces in Vietnam.[70] His wounds required an open amputation of his right leg above the knee, which was done in an evacuation hospital.[71] He also suffered extensive loss of tissue on his left leg, exposing his tibia, and fragment wounds to his right hand and left eye.[72] Sergeant Barry spent the next 13 months assigned to hospitals, until he received a disability retirement in November of 1971.[73]

A rating decision in February 1973 awarded the veteran SMC, effective November 1971, for his loss of one foot.[74] A May 2011 rating decision reflected SMC under section 1114(k),

---

[70] R. at 3298.

[71] R. at 3298, 3391.

[72] R. at 3338, 3391.

[73] R. at 3326.

[74] R. at 2808.

effective from November 1971 to November 2005 for the veteran's loss of one foot; SMC under section 1114(k) effective from July 1983 for the veteran's "loss of use of one eye having only light perception"; SMC under section 1114(m) effective from November 2005 for the veteran's loss of one leg and loss of use of his other leg; and SMC under section 1114(p) and § 3.350(f)(3), at the rate intermediate between subsection (m) and subsection (n), effective from November 2005, for the veteran's

> loss of use of both feet (claimed as muscle graft left leg & previously rated as right above knee amputation; traumatic thrombophlebitis, left leg; SFW, left leg with muscle loss MG XI; s/p left knee replacement; scar of the left calf; & scar, left leg) with additional disabilities, scar of the right flank, status-post muscle graft right latissimus dorsi muscle group II (claimed as back scar from donor site of muscle graft) independently ratable at 50 percent or more.[75, 76]

The May 2011 rating decision lists additional compensable service-connected disabilities, including the following: PTSD, rated 70% disabling; left eye injury with glaucoma, 30%; glenohumeral arthritis of the right shoulder, 30%; glenohumeral arthritis of the left shoulder, 20%; lumbosacral strain, 10%; and healed fractured fingers of the right hand, with traumatic tattooing, 10%.[77] In September 2012, the veteran sought an increase in his SMC.[78]

The most recent rating decision in the record, dated December 2014, recites the same bases for the veteran's SMC that the rating decision recited in May 2011.[79] By December 2014, the veteran's additional compensable service-connected disabilities included all those listed in 2011, with increased ratings for his glenohumeral arthritis of the right shoulder, from 30% to 60%, and for his glenohumeral arthritis of the left shoulder, from 20% to 50%.[80] And the veteran had the following additional service-connected disabilities: Left eye disfigurement, rated at 30%; defective

---

[75] R. at 1005.

[76] The Board refers only to rating decisions issued in February 2011, October 1973, and October 1975. R. at 6. The Board's action regarding the 1973 and 1975 rating decisions was affirmed by the Court in 2019. R. at 127-31. In 2018, the Board found that the February 2011 "rating decision that granted service connection for a scar of the right flank, status-post muscle graft right latissimus dorsi muscle group II and assigned an initial noncompensable rating" was not final and binding because the RO had not issued a Statement of the Case on the matter. R. at 139-40. None of the February 2011, October 1973, and October 1975 rating decisions are at issue in this appeal.

[77] R. at 1003-05.

[78] R. at 816.

[79] R. at 573.

[80] R. at 570-71.

hearing, 20%; bilateral degenerative joint disease of his hips (10% each); hypertension, 10%; and tinnitus, 10%.[81] So the veteran's constellation of compensable disabling conditions includes his above-the-knee amputation of his right leg, loss of use of his left leg, loss of use of both feet, and loss of use of one eye, for which he receives SMC, plus PTSD (70%), right shoulder arthritis (60%), left shoulder arthritis (50%), left eye injury with glaucoma (30%), left eye disfigurement (30%), defective hearing (20%), a lumbar spine injury (10%), a right hand injury (10%), left and right hip joint disease (10% each), hypertension (10%), and tinnitus (10%).

## B.  The Plain Meaning of 38 C.F.R. § 3.350(f)(3)

Based on these facts, the veteran argues that the plain meaning of § 3.350(f)(3) entitles him to four intermediate rate increases, to the SMC rate prescribed by section 1114(o). The Secretary contends that the one intermediate increase the veteran has received is all he is entitled to under the plain meaning of the regulation. The majority reads subsection (f)(3) the way the Secretary does but acknowledges that the plain language of § 3.350(f)(3) does not conclusively resolve the issue. The words I see in subsection (f)(3) give the veteran SMC at the section 1114(n) rate, but no higher.

As the majority notes, if the meaning of a regulation is clear from its language, "that meaning controls."[82] Section 3.350(f)(3), titled "Additional independent 50 percent disabilities," is quite specific. It describes the disabilities that warrant a higher rate of SMC: "additional single permanent disability or combinations of permanent disabilities independently ratable at 50 percent or more . . . [which] must be separate and distinct and involve different anatomical segments or bodily systems from the conditions establishing entitlement" to SMC. Subsection (f)(3) also specifies the outcome: "entitlement to the next higher intermediate rate or if already entitled to an intermediate rate to the next higher statutory rate under 38 U.S.C. 1114, but not above the (o) rate." The subsection makes clear that the rate outcome under § 3.350(f)(3) is in addition to those under the other intermediate rate or next higher rate provisions in the regulation. And it identifies ratings that may not be utilized—those for arrested tuberculosis. What subsection (f)(3) doesn't say or suggest is what VA and the majority contend it means: that only one additional disability, or

---

[81] R. at 571-72.

[82] *Petitti v. McDonald*, 27 Vet.App. 415, 422-23 (2015).

combination of disabilities, rated at 50% counts. The Court should not "read into the regulation a limitation to its applicability that is simply not there."[83]

The majority also misconstrues the significance of the statutory authorization in section 1114(p). Section 1114(p) limits the SMC rate increases for service-connected disabilities that exceed the requirements for the 1114(k) prescribed rates not just to an intermediate rate, but to the next higher rate. As we have previously recognized in considering section 1114, if Congress had intended the limited effect VA and the majority read into the law, Congress could have used stricter and more narrowly tailored language.[84] The actual words of § 3.350(f)(3) limiting entitlement "to the next higher intermediate rate or if already entitled to an intermediate rate to the next higher statutory rate" dovetail with—and give effect to—the section 1114(p) language allowing "the next higher rate or an intermediate rate."

The meaning of § 3.350(f)(3) advanced by the Secretary and sanctioned by the majority apparently adds an unstated qualifier to the regulation. They see a regulation that limits a veteran with additional disabilities (otherwise uncounted in setting SMC) to entitlement "to the next higher intermediate rate or if already entitled to an intermediate rate *under the other intermediate rate provisions outlined above* to the next higher statutory rate." But the italicized words obviously are not in the regulation. "We cannot rewrite [the] text to include criteria absent from its face."[85] VA demonstrated that it knew how to differentiate increases under subsection (f)(3) from those under other subsections of § 3.350, when that was intended, saying in the very next sentence that subsection (f)(3) increases had to be based on disabilities distinct from those establishing entitlement under different statutory subsections "or the intermediate rate provisions outlined above"—apparently referring to the intermediate rate provisions in § 3.350(f)(1) and (f)(2).

The qualifying word VA actually chose to use in subsection (f)(3)—"already"—is an adverb that expresses a temporal relation. "Already" means "[b]y or before a time stated or implied."[86] So subsection (f)(3), by its terms, entitles a veteran previously entitled to an intermediate rate—as Mr. Barry was, effective November 2005 per the May 2011 rating

---

[83] *See Southall-Norman v. McDonald*, 28 Vet. App. 346, 351-52 (2016).

[84] *Payne v. Wilkie*, 31 Vet.App. 373, 385 (2019).

[85] *Langdon v. McDonough*, 1 F.4th 1008, 1011 (Fed. Cir. 2021).

[86] BALLENTINE'S LAW DICTIONARY 64 (3d ed. 1969); *see* WEBSTER'S NEW WORLD DICTIONARY, COLLEGE EDITION 42 (1968) (defining "already" as "by or before the given or implied time; previously").

decision—to the next higher statutory rate (for him, the section 1114(n) rate) if a later increase in his qualifying permanent disabilities warrants it. That issue was not addressed by the Board.

Moreover, this case shows the fallacy of the notion that subsection (f)(4) means that subsection (f)(3) must permit only one SMC intermediate step increase. Nothing about reading subsection (f)(3) to entitle a veteran with sufficient additional disabilities to a second intermediate step, thereby going to the next higher statutory rate, renders (f)(4) superfluous or meaningless. Section 3.350(f)(4) establishes entitlement to a full step up—based on an "additional single permanent disability independently ratable at 100 percent apart from any consideration of individual unemployability"—that is, to the next higher statutory rate; or if the veteran is already entitled to an intermediate rate, § 3.350(f)(4) entitles the veteran to the next higher intermediate rate. The rating for a veteran with a single permanent disability independently ratable at 100% can advance a full step immediately, so there is nothing incongruous or odd in the potential for a veteran's disability rating to advance two intermediate steps over time (to reach the next higher statutory rate) for two single permanent disabilities or combinations of permanent disabilities independently ratable at 50% or more. Mr. Barry's circumstances illustrate that point emphatically. Using common math, the 12 additional compensable disabilities listed in Mr. Barry's December 2014 rating decision total 320%! And applying the VA formula for arriving at combined ratings[87] results in a 100% rating when just his four highest rated additional disabilities are counted.

### C. VA's Duty To Maximize Benefits

The majority's ratification of the Secretary's interpretation of § 3.350(f)(3) also conflicts with VA's duty to maximize benefits. "VA's duty to maximize benefits requires VA to assess all of the claimant's disabilities . . . to determine whether any combination of the disabilities establishes entitlement to special monthly compensation."[88] And VA's duty to maximize benefits requires it to resolve doubt in favor of claimants, including when determining SMC.[89] VA failed to fulfill these obligations here, instead reading restrictions into § 3.350(f)(3) that are not there—

---

[87] *See* 38 C.F.R. § 4.25 (2021).

[88] *Buie v. Shinseki*, 24 Vet.App. 242, 250 (2010), *as amended* (Apr. 21, 2011).

[89] *Morgan v. Wilkie*, 31 Vet.App. 162, 164, 167-68 (2019); *see* 38 C.F.R. §§ 3.103(a) (2021), 4.3 (2021).

which VA cannot do, "because, in doing so, [it] imposes a greater burden on a claimant than the law does."[90]

### D. The Pro-Veteran Canon

In addition, the construction of § 3.350(f)(3) argued by VA and adopted by the majority conflicts with the longstanding pro-veteran canon—"'that provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor.'"[91] The Secretary argues that the pro-veteran canon does not apply because subsection (f)(3) is not ambiguous, and the majority seems to agree. But the space between the majority's assessment that the plain language of the regulation is not conclusive and the majority's ultimate indication that the regulation is not genuinely ambiguous highlights the canon's significance.

The path from inconclusive language to no genuine ambiguity is well mapped but a little slippery. Determining the plain meaning of a regulation requires the Court to "bring all its interpretative tools to bear" to "make a conscientious effort to determine, based on indicia like text, structure, history, and purpose, whether the regulation really has more than one reasonable meaning."[92] We look to the law to determine whether "there is only one reasonable construction of a regulation."[93] The canons of regulatory construction "require interpretation of words in their context with an eye to the law as a whole."[94] The context of the law as a whole seems to include the veteran's canon.[95]

In *King v. St. Vincent's Hospital*, the Supreme Court stated that it presumed that Congress understood the pro-veteran canon as a basic rule of statutory construction, and the Court applied that canon to read a provision in the veteran's favor, even if the language left its significance unsettled.[96] In *Henderson v. Shinseki*, the Supreme Court read the statute at issue in light of the veteran's canon, declaring that "[w]hile the terms and placement of [the statute] provide some

---

[90] *Ward v. Wilkie*, 31 Vet.App. 233, 240 (2019); *English v. Wilkie*, 30 Vet.App. 347, 353 (2018).

[91] *Henderson v. Shinseki*, 562 U.S. 428, 441 (2011) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.9 (1991)).

[92] *Huerta v. McDonough*, 34 Vet.App. 76, 80 (2021) (quoting *Kisor v. Wilkie*, 139 S. Ct. 2400, 2423-24 (2019)).

[93] *Kisor*, 139 S. Ct. at 2415.

[94] *Ortiz-Valles v. McDonald*, 28 Vet.App. 65, 69 (2016).

[95] *See Henderson*, 562 U.S. at 440-42; *King*, 502 U.S. at 221 n.9; *Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285 (1946).

[96] 502 U.S. at 221 n.9.

indication of Congress' intent, *what is most telling here* are the singular characteristics of the review scheme that Congress created for the adjudication of veterans' benefits claims."[97] In *Fishgold Sullivan Drydock & Repair Corp.*, the Supreme Court declared that veterans laws are "to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need," and the Court showed us how to do so—"construe the separate provisions of the [law] as parts of an organic whole and give each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits."[98]

The slipping stems from two words in an oft cited pro-veteran canon case, *Brown v. Gardner*: "interpretive doubt."[99] In *Gardner*, the Board denied the veteran's claim for benefits under 38 U.S.C. § 1151 based on disabilities resulting from surgery in a VA facility.[100] The Board's denial rested on 38 C.F.R. § 3.358(c)(3) (1993), which interpreted the statute as only covering an injury that proximately resulted from fault by the VA or from an accident during treatment or rehabilitation.[101] Though the statute afforded compensation for injuries resulting from surgery, rather than the veteran's misconduct, and said nothing about fault by VA, the Secretary argued that a fault requirement inhered in the statutory requirement of a compensable injury.[102] In rejecting that argument based on the law's "text and reasonable inferences from it," the Supreme Court looked first to the pro-veteran canon, which it summarized as "the rule that interpretive doubt is to be resolved in the veteran's favor."[103]

In *Kisor v. Wilkie*, the Supreme Court declared that courts must exhaust all the traditional tools of construction before concluding that a rule is genuinely ambiguous, but the Court did not address whether the pro-veteran canon is part of that toolkit.[104] On remand, the Federal Circuit

---

[97] 562 U.S. at 440-42 (emphasis supplied).

[98] 328 U.S. at 285.

[99] 513 U.S. 115, 118 (1994).

[100] *Id.* at 116-17.

[101] *Id.*

[102] *Id.* at 117.

[103] *Id.* at 117-18. *See* Chadwick J. Harper, *Give Veterans the Benefit of the Doubt:* Chevron, Auer, *and the Veteran's Canon*, 42 HARV. J.L. & PUB. POL'Y 931, 958-59, 961 (2019) ("The language and logic of [*Gardner*] suggest that courts should apply the veteran's canon before turning to deference doctrines," and "*Gardner*'s suggested order of operations" is one reason "the veteran's canon should be recognized as a traditional tool of interpretation.").

[104] 139 S. Ct. at 2415.

filled the breach, declaring: "Under [*Gardner*] . . . the canon does not apply unless 'interpretive doubt' is present," a precondition which "is not satisfied where a sole reasonable meaning is identified through the use of ordinary textual analysis tools, before consideration of the pro-veteran canon."[105] On that basis, the Federal Circuit determined that the canon did not apply because the regulatory text at issue had only one reasonable meaning.[106] The conclusion in *Kisor IV* that the disputed term was not ambiguous[107] was the opposite of its prior holding—which did not cite *Gardner* or mention the pro-veteran canon. [108]

The dissent in *Kisor v. McDonough* (*Kisor IV*) disagreed that interpretive doubt "must be established before the pro-veteran canon can be applied."[109] Judge Reyna declared:

> Fundamentally, when a veterans' benefit provision is ambiguous on its face, the pro-veteran canon must be weighed alongside the other traditional tools in resolving interpretive doubt, including whether interpretative doubt exists. Neither the Supreme Court's decision in this case, nor this court's precedent, supports the majority's assumption that interpretive doubt is to be determined before resort to the pro-veteran canon may be had. To the contrary, the pro-veteran canon is a traditional tool of construction. It requires that we discern the purpose of a veterans' benefit provision in the context of the veterans' benefit scheme as a whole and ensure that the construction effectuates, rather than frustrates, that remedial purpose: that benefits that by law belong to the veteran go to the veteran.[110]

The debate continued when the Federal Circuit denied the veteran's petition for en banc review.[111] A concurrence concluded that *Gardner* made interpretive doubt "a precondition for applying the canon," and "the hierarchy of interpretive tools" means courts "should consider the pro-veteran canon only if, after exhausting all applicable descriptive tools in search of the provision's best meaning, a range of plausible interpretations remains, none of them fairly described as the best."[112] A dissenter's response included the following:

---

[105] *Kisor v. McDonough*, 995 F.3d 1316, 1325-26 (Fed.Cir. 2021) (*Kisor IV*) (quoting *Gardner*, 513 U.S. at 117-18), *cert. denied*, No. 21-465, 2022 WL 89296 (U.S. Jan. 10, 2022).

[106] *Id.* at 1326.

[107] *Id*. at 1319.

[108] *Kisor v. Shulkin*, 869 F.3d 1360 (Fed. Cir. 2017) (*Kisor I*), *vacated and remanded sub nom. Kisor v. Wilkie*, 139 S. Ct. 2400 (2019).

[109] *Kisor IV*, 995 F.3d at 1327 (Reyna, J., dissenting).

[110] *Id.*

[111] *Kisor v. McDonough*, 995 F.3d 1347 (Fed. Cir. 2021) (per curiam order) (*Kisor V*).

[112] *Id.* at 1354-59 (Prost, C.J., concurring).

> The pro-veteran canon of construction is not meant to be an afterthought. It is a tool in the interpretive toolkit that aids in gleaning congressional intent where the plain text of the statute or regulation does not clearly answer the question at hand. . . . The majority . . . cites only *Brown v. Gardner* for its decision to remove the pro-veteran canon—and apparently numerous other canons—from the interpretive toolkit it employs. But [*Gardner*] does not hold that the pro-veteran canon is only an after the fact inquiry. . . [a]nd, it does not say that the pro-veteran canon is anything other than an interpretive canon. . . . The panel majority's latest approach is inconsistent with multiple Supreme Court cases which discuss the pro-veteran canon and treat it as one of the many canons of construction to be collectively employed when interpreting veterans benefit provisions. . . . [W]hen reviewing an agency's interpretation of a statute or regulation (as is the case here), the Supreme Court has made clear that we are to apply all tools of statutory construction to glean congressional intent. Where differing plausible, reasonable interpretations of the terms of a regulation are possible, Congress has spoken: it wants veterans' benefits to be administered in a "pro-claimant" manner.[113]

And Judge Reyna added: "[*Kisor IV*] means that the pro-veteran canon comes into play at the bottom of the ninth inning, after three outs have been made, and as the players head to their respective dugouts. But by then, it's game over."[114]

Of course, we cannot decide whether *Gardner* bears the weight *Kisor IV* gives it (by *Gardner's* terms and in light of *Henderson*, *King*, and *Fishgold*), and we need not try to do so to resolve this case—because the situation here fits nicely within *Gardner*, whether read through the lens of the majority or the dissenter in *Kisor IV*, or those of the concurrences or dissents in *Kisor v. McDonough* (*Kisor V*). At most, the Secretary has shown the existence of ambiguity in the text and meaning of 38 C.F.R. § 3.350(f)(3), and the pro-veteran canon mandates that such interpretive doubt be resolved in the veteran's favor.[115]

E. Deference to the Secretary's Interpretation of § 3.350(f)(3)

At oral argument, in response to direct questions by the Court, the Secretary contended—for the first time—that if § 3.350(f)(3) was deemed ambiguous, VA's consistent approach and interpretation that only one half-step increase is permitted should be given deference. As support, the Secretary pointed only to VA's *Adjudicative Procedures Manual* (M21-1). But deference is not warranted under these circumstances. The Court generally won't entertain contentions raised for

---

[113] *Id*. at 1366 (O'Malley, J., dissenting).

[114] *Id*. at 1376.

[115] *See Gardner*, 513 U.S. at 118; *Osman v. Peake*, 22 Vet.App. 252, 256 (2008).

the first time by counsel at oral argument.[116] The M21-1 provision was never cited or discussed—by the parties, the regional office, or the Board—so there is no indication that it was the basis of the denial of the veteran's request for SMC at a higher rate.[117]

The pertinent M21-1 section states: "Apply the provisions of 38 CFR 3.350(f)(3) or 38 CFR 3.350(f)(4), whichever is appropriate, only once in a rating decision."[118] Then the section emphasizes that "[c]oncurrent entitlement to SMC under both 38 CFR 3.350(f)(3) and 38 CFR 3.350(f)(4) is prohibited."[119] If we entertain the Secretary's belated and underdeveloped argument, we should hold that neither manual provision merits deference. Interpretations according to agency manuals lack the force of law and do not warrant deference.[120] The Board is not bound by the M21-1, so the Court will not defer to it.[121] And deference is especially inappropriate where, as here, the manual adds a limitation to the applicability of a regulation.[122]

The manual's statement regarding the interplay of subsections (f)(3) and (f)(4) has no direct application to Mr. Barry, but it bears on the majority's stated belief that two steps under subsection (f)(3) cannot be harmonized with subsection (f)(4) and the Secretary's contention at oral argument that a veteran could not receive SMC under both subsections. That contention does not square with the subsection itself. Subsection (f)(4) specifies that its whole step increase is "[i]n addition to . . . the intermediate or next higher rate provisions outlined above," which include subsection (f)(3). The manual's directions do not deserve deference because they are not reasonable interpretations of the regulation.[123] Moreover, as previously indicated, to the extent the regulation permits a reading that would entitle the veteran to the next higher statutory rate of SMC for his constellation of additional permanent disabilities, the pro-veteran canon requires the more expansive reading.[124]

---

[116] *Ray v. Wilkie*, 31 Vet.App. 58, 69-70 (2019); *Overton v. Wilkie*, 30 Vet.App. 257, 265 (2018).

[117] *Ray*, 31 Vet.App. at 69-70; *Overton*, 30 Vet.App. at 265.

[118] *See* VA ADJUDICATIONS PROCEDURES MANUAL M21-1, pt. VIII, subpt. iv, ch. 4, § A.6.a., http://www.knowva.ebenefits.va.gov (last visited Jan. 17, 2022).

[119] *Id.* at § A.6.b.

[120] *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000).

[121] *Ray*, 31 Vet.App. at 70.

[122] *See Lyles v. Shulkin*, 29 Vet.App. 107, 115-16 (2017).

[123] *See Kisor*, 139 S. Ct. at 2416.

[124] *See Sharp v. Shinseki*, 23 Vet.App. 267, 275-76 (2009).

When "the Secretary's interpretation is unfavorable to veterans, such that it conflicts with the beneficence underpinning VA's veterans benefits scheme, and a more liberal construction is available that affords a harmonious interplay between provisions," the more liberal construction prevails.[125]

Furthermore, VA should not be allowed to institute, via its procedures manual, more restrictions on veterans benefits than it proposed and adopted through notice and comment rulemaking.[126] Deference is unwarranted under the circumstances presented in this case because such deference would permit VA, under the guise of interpreting § 3.350(f)(3), "to create de facto a new regulation."[127]

F. Conclusion

The veteran was already receiving SMC at the intermediate rate between section 1114(m) and 1114(n), so his increasingly extensive disabilities entitle him to the full measure of SMC that section 1114(p) and § 3.350(f)(3) authorize: the next higher statutory rate—the rate payable under section 1114(n). The plain meaning of the statute and regulation therefore require reversal of the Board's denial of entitlement at the 1114(n) rate. To the extent the plain language of the law is not conclusive, the plain meaning is unsettled or ambiguous, there is interpretive doubt, or there is more than one reasonable interpretation, the pro-veteran canon also requires reversal.

For the foregoing reasons, I respectfully dissent from the majority's affirmance of the Board's denial of the veteran's entitlement to SMC at the 1114(n) rate.

---

[125] *See Trafter v. Shinseki*, 26 Vet.App. 267, 272 (2013).

[126] *See Bailey v. Wilkie*, 33 Vet.App. 188, 203 (2021); *Murillo v. Brown*, 10 Vet.App. 108, 110 (1997).

[127] *See Kisor*, 139 S. Ct. at 2415 (quoting *Christensen*, 529 U.S. at 588).